IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FARID DAMESHGHI,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:08-CR-127<br>Judge Dee Benson |

This matter is before the court on defendant's motion to suppress. (Dkt. No. 24.) On December 18, 2008, the court conducted an evidentiary hearing on the motion. Defendant Farid Dameshghi was present with his counsel, Jason A. Schatz. The government was represented by John Huber. Following the hearing, the court ordered a transcript and set a briefing schedule. At the defendant's request, on June 10, 2009, the court heard oral argument on the matter. On July 2, 2009, the court granted defendant's motion to supplement the record. (Dkt. No. 54.) After review and consideration of the memoranda submitted by the parties, the testimony presented at the evidentiary hearing, and the oral arguments presented by counsel, the court enters the following memorandum decision and order.

## FACTUAL FINDINGS

The court finds the relevant facts as follows.[1]  On November 30, 2007, Salt Lake County Deputy Sheriff Kochanowski was on routine patrol, which included traffic enforcement, in a marked patrol car on the east side of Salt Lake County.  (Tr. at 6, 9, 12.)  At approximately 5:00 p.m. Deputy Kochanowski was driving northbound on 1300 East at approximately 9400 South.  (Tr. at 7.)   It had rained earlier in the day, the sky was overcast, and it was beginning to get dark. (Tr. at 8.)  The traffic at the time was "quite heavy."  (Tr. at 8, 22.)

While Deputy Kochanowski was traveling north on 1300 East he noticed a white passenger car that did not have the required license plate light to illuminate the rear license plate.  (Tr. at 9-10.)  Deputy Kochanowski observed that although the vehicle's headlights were activated, the license plate light was inoperable, and he was aware that this was an equipment violation under Utah law.  (Tr. at 9, 10, 13, 22.)  Deputy Kochanowski followed the vehicle through traffic and pulled directly behind it.  (Tr. at 12.)  To confirm that the license plate light was in fact inoperable, and not simply overpowered by the patrol car's headlights, Deputy Kochanowski turned the patrol car's headlights off and then on again.  (Tr. at 12.)  After confirming that the license plate light was inoperable, Deputy Kochanowski, consistent with his routine practice, "ran the plate" to make sure the vehicle was not stolen.  (Tr. at 12.)

Based on the observed equipment violation, Deputy Kochanowski decided to initiate a traffic stop of the vehicle.  (Tr. at 10.)  He activated his overhead lights and the white passenger car pulled to the right side of the road.  (Tr. at 12.)  Deputy Kochanowski approached the driver,

---

[1]Reference to the transcript of the evidentiary hearing conducted on December 18, 2008, will be cited as "Tr. at __."

introduced himself, and informed the driver that he had been stopped because of an inoperable license plate light. (Tr. at 13.) Deputy Kochanowski then confirmed that the vehicle's headlights were in the "on" position, and he had the driver turn the headlights off an on again. During this time, Deputy Kochanowski observed the license plate light again, and confirmed that it was not working. (Tr. at 13, 23.)

Deputy Kochanowski asked the driver for his driver's license, registration and proof of insurance. (Tr. at 14.) The driver, defendant Farid Dameshghi, complied. As Mr. Dameshghi was retrieving the requested documentation, Deputy Kochanowski noticed that he had two different identifications; a Utah driver's license and a California identification card. (Tr. at 14.)

Mr. Dameshghi's possession of identification cards from two different states was a "red flag" because in Deputy Kochanowski's experience "a lot of criminals like to go from state to state and obtain different I.D.s so that if they are in Utah they can use a California driver's license, because we can't pull up state warrants from California, and all kinds of different things." (Tr. at 15, 29.) Moreover, Deputy Kochanowski understood that it was illegal to have identification cards from two different states. (Tr. at 26.) Because the two identification cards made Deputy Kochanowski suspicious, he asked Mr. Dameshghi some additional questions. (Tr. at 15-16.)

Deputy Kochanowski asked Mr. Dameshghi why he had a California identification card. Mr. Dameshghi replied that when he came to America four years ago he moved to California. (Tr. at 15, 16.) Deputy Kochanowski then asked if he had any documentation, "a green card or anything," to which Mr. Dameshghi replied that he had a green card, but it had expired. (Tr. at 16.) Mr. Dameshghi provided Deputy Kochanowski the expired green card. Deputy

3

Kochanowski could not recall whether he took possession of the card or returned it to Mr. Dameshghi.  (Tr. at 29.)

After speaking with Mr. Dameshghi at his vehicle for approximately five to ten minutes, Deputy Kochanowski returned to his patrol car.  (Tr. at 25.)  To further his investigation, and to further investigate whether Mr. Dameshghi's expired green card had been renewed, Deputy Kochinowski called dispatch.  (Tr. at 17, 30.)  Additionally, hoping to expedite the situation because dispatch can be "a little bit slow," at approximately 5:15 p.m. Deputy Kochanowski used his cell phone to make a direct call to Special Agent Adam Parks with Immigration and Customs Enforcement ("ICE").  (Tr. at 17, 25, 30.)  Deputy Kochanowski routinely calls ICE for assistance when necessary, and whether ICE responds depends on the situation and availability.  (Tr. at 17.)  On this day, ICE Agent Parks indicated that he was in the area, approximately ten to fifteen minutes away, and available to assist. (Tr. at 31, 43, 75.)

In addition to calling dispatch and Agent Parks, Deputy Kochanowski also began "running everything through the computer."  (Tr. at 42.)  Deputy Kochanowski checked the Utah driver's license to confirm that there were no warrants.  However, he did not check the legitimacy of the California identification card because neither dispatch nor the computer system had the ability to do so.  (Tr. at 43.)  Deputy Kochanowski also prepared and printed a citation for the equipment violation during this time.  (Def.'s Ex. 1, traffic citation printed at 5:22 p.m..)

After calling dispatch and ICE, drafting the citation, and completing the permissible computer checks, Deputy Kochanowski returned to Mr. Dameshghi's vehicle to issue the citation.  Deputy Kochinowski did not wait for the ICE agents to arrive before issuing the traffic citation, and he did not slow down the traffic stop or the citation process as a result of his call to

ICE for assistance. (Tr. at 35, 39-40, 43.) When Deputy Kochanowski returned to Mr. Dameshghi's vehicle he obtained Mr. Dameshghi's signature on the citation and explained the procedure for contacting the court in response to the citation. (Tr. at 36.) Deputy Kochinowski provided Mr. Dameshghi with his copy of the citation, returned his documentation, and told Mr. Dameshghi he was done with the traffic stop. (Tr. at 36.)

ICE Agent Parks, assisted by ICE Agent Jeffrey Hoover, pulled up behind Deputy Kochanowski's marked patrol vehicle as Deputy Kochanowski was concluding the traffic stop. (Tr. at 31, 39-40, 49.)[2] The ICE agents spoke briefly with Deputy Kochanowski before

---

[2]Defense counsel argues that there was a gap of at least 30 minutes between the completion of the traffic stop and the ICE agents arrival, rendering the detention "constitutional[ly] untenable." (Def.'s Mem. In Supp. at 10.) In making this argument, defense counsel relies on the time the citation was printed, 5:22 p.m., and ICE Agent Parks' written report, stating that he received Deputy Kochanowski's phone call at approximately 5:45 p.m. and arrived on scene fifteen minutes later at approximately 6:00 p.m. (Tr. at 90-91.) The court rejects defendant's position.

First, the time at which the citation was *printed* is not an indication of the time at which the traffic stop concluded (the time at which Deputy Kochanowski finished running his lawfully permitted computer checks and physically issued the citation to Mr. Dameshghi). Similarly, Agent Parks testified that his report, which was not introduced in evidence, was drafted after-the-fact and contained only approximations of time which he admitted were arrived at by "working back" from the notations of time set forth in other documents such as the Miranda waiver and consent to search forms. (Tr. at 91.)

Most importantly, however, the uncontroverted testimony at the evidentiary hearing was that the ICE agents arrived on scene nearly simultaneously with Deputy Kochanowski's conclusion of the traffic stop. (Tr. at 31 ([Deputy Kochanowski] "I don't recall [the ICE] agents present at the window when I went up to cite him. I can't recall. I want to say they were at the back of the vehicle when I cited him"); Tr. at 39-40 (Deputy Kochanowski: "It was in close proximity of when I cited him that they showed up. Whether it was a minute or two before I did it or right after I got done citing him, I can't recall exactly"); Tr. at 49 ([Agent Hoover] the deputy was still handling the traffic citation when ICE agents arrived).) Additionally, Deputy Kochanowski testified that he called Agent Parks at approximately 5:15 p.m., and both ICE agents testified that they arrived in less than thirty minutes after receiving the call. (Tr. at 47 ([Agent Hoover] We arrived at the location "fairly quickly" and "within less than thirty minutes" of receiving Deputy Kochanowski's call); Tr. at 75 ([Agent Parks] We were approximately 10 to 15 minutes away when we got the call and went straight there).) Based on this testimony, the

approaching Mr. Dameshghi's vehicle. (Tr. at 48.) Based on the information provided by Deputy Kochinowski, the agents were aware that Mr. Dameshghi had an expired resident alien card (a.k.a. an expired I-551), and they sought to determine Mr. Dameshghi's immigration status. (Tr. at 49, 51.) Agent Hoover was not in uniform, but was wearing a badge on his belt to identify him as an ICE agent. Agent Hoover was armed with his pistol, but it remained holstered and underneath his jacket. (Tr. at 53.) Agent Parks was wearing his "typical enforcement gear," which included his gun and a jacket that said "police" and "ICE" on it. (Tr. at 78.)

Agent Hoover approached the driver's side while Agent Parks approached the passenger side of Mr. Dameshghi's vehicle. (Tr. at 50.) Agent Hoover introduced himself and asked a few brief questions about Mr. Dameshghi's status in the country. (Tr. at 62.) During this brief, initial encounter, Agent Hoover was able to establish that Mr. Dameshghi was from Iran, that he was not a United States citizen, and that at the time he had no proof that he was legally in the United States. (Tr. at 63.) According to Agent Hoover, "by law [Mr. Dameshghi] was required to carry paperwork showing that he has legal status," and he had "no such proof." (Tr. at 65.)

For officer safety purposes, Agent Hoover then asked Mr. Dameshghi if he had any weapons and asked if the agents could search to make sure there were no weapons in the vehicle. (Tr. at 50, 63, 66.) Mr. Dameshghi consented to the search of his vehicle. (Tr. at 50, 66.) Agent Hoover asked Mr. Dameshghi if he would mind stepping out of and to the rear of the vehicle so Agent Hoover could continue his interview while Agent Parks looked in the car. (Tr. at 62-63.) When Mr. Dameshghi exited the vehicle, Agent Parks also asked for permission to search the

---

court finds that the ICE agents arrived on scene as Deputy Kochanowski was concluding the traffic stop.

vehicle and Mr. Dameshghi once again consented.  (Tr. at 63, 78.)  Mr. Dameshghi was "very cooperative," and the exchange between Mr. Dameshghi and the ICE agents was  "very relaxed," "unemotional" and "professional." (Tr. at 79.)

For the next five or ten minutes, while standing at the rear of the vehicle, Agent Hoover asked Mr. Dameshghi more detailed questions about his immigration status.  (Tr. at 52-53, 55.) During this conversation Mr. Dameshghi claimed that he had filed the proper paperwork to renew the card, but did not have proof of that with him.  (Tr. at 51.)  Mr. Dameshghi said the paperwork was at his house and the agents could go to his house and get it.  (Tr. at 53, 56.) Agent Hoover acknowledged that Mr. Dameshghi "knew the process very well," yet he remained unable to confirm whether Mr. Dameshghi had in fact extended his status appropriately.  (Tr. at 65.)  Moreover, given that Mr. Dameshghi's green card had only recently expired, Agent Hoover questioned whether a computer search would be a reliable indicator of whether Mr. Dameshghi requested an extension because of they delay in entering such information into the database.  (Tr. at 64, 72.)  Because he was unable to confirm whether Mr. Dameshghi had applied for the extension, Agent Hoover determined that they would continue the investigation to Mr. Dameshghi's home where they could retrieve the necessary paperwork.  (Tr. at 71.)

While Agent Hoover was talking with Mr. Dameshghi at the rear of the vehicle, Agent Parks looked inside the vehicle where he immediately noticed a black bag on the front passenger seat. (Tr. at 79.)  Believing the black bag could possibly contain a weapon, Agent Parks unzipped the bag and looked inside.  Inside the bag Agent Parks discovered "a bundle of cash," which he estimated to be "tens of thousands of dollars" in United States currency.  (Tr. at 79, 80.)  After discovering the money, Agent Parks approached Mr. Dameshghi, who was still

speaking with Agent Hoover at the rear of the vehicle. (Tr. at 80.)

Agent Parks told Mr. Dameshghi that he had discovered money in a bag on the passenger side of the vehicle and asked Mr. Dameshghi to explain. (Tr. at 80.) Mr. Dameshghi responded that the money was going to a relative in Canada. (Tr. at 80-81, 98.) Agent Parks did not believe Mr. Dameshghi's explanation. He did not find it reasonable "that someone would be carrying that amount of cash to transfer it to Canada." (Tr. at 81.) Because Agent Parks was skeptical of Mr. Dameshghi's explanation, he reminded Mr. Dameshghi of the "seriousness of the matter," and that it was a federal offense to make a false statement. He told Mr. Dameshghi that he was "addressing a federal officer" and he needed to be honest. (Tr. at 81.)

After discovering the large amount of cash in Mr. Dameshghi's vehicle the ICE agents directed Deputy Kochinowski to call for a K-9 unit. (Tr. at 19, 99.) Given the ICE agents' training and experience they were concerned that the possession of such a large quantity of cash might be connected to narcotics. (Tr. at 82.) It took approximately ten to fifteen minutes for the K-9 unit to arrive. (Tr. at 19, 82.) Upon arrival, the drug-detection dog was allowed to circle and enter Mr. Dameshghi's vehicle where it "hit" on the black bag in the passenger seat. (Tr. at 20.) Mr. Dameshghi, Agent Parks and Agent Hoover observed the K-9 activity and were informed that the dog "hit" on the black bag. (Tr. at 83.)

Following the K-9 search of the vehicle, Mr. Dameshghi approached Agent Parks and told him that he had previously been dishonest and that the money was going to Iran rather than Canada. (Tr. at 84.) Agent Parks was aware that Iran was "an embargo country" and therefore became increasingly concerned that Mr. Dameshghi was committing a crime. (Tr. at 100-01.)

Agent Parks told Mr. Dameshghi that he would like to ask some additional questions

about the money and asked Mr. Dameshghi to sit with him inside an ICE vehicle to get out of the cold and discuss the matter further.  Inside the vehicle, with ICE Agent Chuck Johnson[3] present, Agent Parks began by telling Mr. Dameshghi that he was not under arrest but advised him of his rights pursuant to Miranda notwithstanding.  (Tr. at 84-85.)  Mr. Dameshghi executed a Miranda waiver form and agreed to speak with Agent Parks about the money.  (Tr. at 85, 104; Govt's Ex. 1.)  The interview lasted approximately 45 minutes.  (Tr. at 87.)

At some point during the interview, Agent Hoover, still pursuing his investigation into Mr. Dameshghi's immigration status, interrupted in order to complete a "consent to search" form for Mr. Dameshghi's house in order to retrieve his immigration documents.  (Tr. at 56, 87.)  Although the agents had already searched Mr. Dameshghi's vehicle based on oral consent, Agent Hoover nonethess asked Mr. Dameshghi to memorialize his prior oral consent within the written consent to search form.  (Tr. at 56-57; Pl.'s Ex. 2.)  Accordingly, the written consent to search form signed by Mr. Dameshghi included permission to search both Mr. Dameshghi's home and vehicle.  (Pl.'s Ex. 2.)  After Agent Parks concluded his interview with Mr. Dameshghi, the agents accompanied Mr. Dameshghi to his house where they executed the consent search without incident.  (Tr. at 88.)

On March 5, 2008, Mr. Dameshghi was charged in a one-count indictment with money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).  Thereafter, Mr. Dameshghi moved to suppress "any and all evidence seized in this case after the initial traffic stop and detention" because: (1) the initial traffic stop was not justified at its inception; (2) the detention exceeded

---

[3]ICE Agent Chuck Johnson arrived at the location as "backup" sometime after the arrival of agents Hoover and Parks.  (Tr. at 85.)

the scope of the stop and was therefore unlawful; and (3) the search of Mr. Dameshghi's vehicle was unlawful because his consent was invalid.

## DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by government actors.  See U.S. Const. Amend. IV; United States v. Sanchez, 89 F.3d 715, 717 (10th Cir. 1996).  "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable."  Wilson v. Arkansas, 514 U.S. 927, 931 (1995). It is well established that a routine traffic stop and investigative detention, such as the one at issue in this case, is a seizure within the meaning of the Fourth Amendment.  United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995), cert. denied, 518 U.S. 1007 (1996). The reasonableness of such detentions is reviewed under a two-part test set forth in Terry v. Ohio, 392 U.S. 1, 20 (1968).  Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception and second whether it was reasonably related in scope to the circumstances which justified the interference in the first place.  United States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001), cert. denied, 535 U.S. 1019 (2002).

**A. The Initial Stop of Mr. Dameshghi's Vehicle**

A traffic stop is justified at its inception if "the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d at 787.  "Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated '*any one of the multitude of applicable traffic and equipment regulations*' of the jurisdiction."  Id. (emphasis added) (quoting Delaware v. Prouse, 440 U.S. 648, 661 (1979)).

In this case, Deputy Kochanowski stopped Mr. Dameshghi's vehicle based on an observed equipment failure which was a violation of Utah law. The Utah Code provides that "a person may not operate or move . . . on a highway a vehicle . . . which does not contain those parts or is not at all times equipped with lamps and other equipment in proper condition and adjustment as required in this chapter." Utah Code Ann. § 41-6a-1601(1)(a)(ii) (2007). Additionally, § 41-6a-1604(2)(c) requires that a motor vehicle shall have "either a tail lamp or a separate lamp . . . to illuminate with a white light the rear registration plate." Id.

Deputy Kochanowski testified that upon first observing Mr. Dameshghi's vehicle he believed the license plate light was inoperable. (Tr. at 9-10.) However, rather than pull the vehicle over immediately, Deputy Kochinowski pulled directly behind the vehicle and then turned on and off his own headlights to make sure that the patrol car's lights were not simply "over powering" the license plate light. (Tr. at 12.) Based on these observations, the court concludes that Deputy Kochanowski had reasonable articulable suspicion that Mr. Dameshghi was in violation of the equipment regulation requiring a rear license plate light.[4]

The fact that Mr. Dameshghi might not have been required by law to have his headlights and license plate light "on" at the time of the time of the stop is irrelevant so long as the officer had reasonable suspicion of an equipment violation. See United States v. Garcia-Rodriguez, 127

---

[4]Defense counsel makes much of the fact that Mr. Dameshghi may have simply had his daytime running lights operating at the time of the stop, and operation of the daytime running lights does not cause the license plate light to be illuminated. However, even if that had been the case, Deputy Kochanowski testified that he believed the actual headlights were on, and therefore, based on his perception he would nonetheless have had reasonable suspicion of an equipment violation sufficient to justify stopping the vehicle. And, in any event, once he stopped the vehicle, he had Mr. Dameshghi turn on and off the headlights to confirm the equipment violation.

Fed. Appx. 440, 2005 WL 752728 (10th Cir. April 24, 2005) (unpublished) (upholding stop based on equipment violation, and rejecting defendant's argument that stop based on non-working headlight was not justified because it occurred mid-day when drivers were not required to have lights on). There is nothing in the traffic code that states that a motorist can be pulled over only at night for a headlight or license plate light violation, see id., and the Utah Code provides specifically that a vehicle must be "*at all times* equipped with lamps and other equipment *in proper condition.*" see Utah Code Ann. § 41-6a-1601(1)(a)(ii). Therefore, the court concludes that because Deputy Kochanowski had reasonable suspicion that Mr. Dameshghi was operating a vehicle with an inoperable license plate light in violation of Utah law, the initial stop did not offend Mr. Dameshghi's Fourth Amendment rights.

### B. The Continued Detention of Mr. Dameshghi

Having determined that the traffic stop was justified at its inception, the court must ask "whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500 (1983). With regard to permissible conduct during a traffic stop, the United States Court of Appeals for the Tenth Circuit has established that the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. United States v. Walker, 933 F.2d 812, 816 (10th Cir. 1991); United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990), cert. denied, 501 U.S. 1207 (1991). "If the driver produces a valid license and

12

proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning." Pena, 920 F.2d at 1514. However, an officer may detain a driver for further questioning unrelated to the initial traffic stop if the officer develops a reasonable and articulable suspicion that the driver has engaged or is engaging in illegal activity or if the initial detention has become a consensual encounter. United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998).

Mr. Dameshghi asserts that his continued detention and subsequent questioning exceeded the permissible scope of the traffic stop. More specifically, he claims that Deputy Kochanowski continued to detain him for as long as 35 minutes after issuing the traffic citation while he waited for the ICE agents to arrive, and that he did so without any additional or independent justification, rendering the detention unlawful. (Def.'s Mem. In Supp. at 8.) The court disagrees.

First, in the factual findings set forth above the court explicitly finds that the ICE agents arrived on scene as Deputy Kochanowski was concluding the traffic stop. (Tr. at 31, 39-40, 49.) Because the ICE agents arrived simultaneously with the conclusion of the traffic stop, there was no unreasonable delay between the conclusion of the traffic stop and the ICE agents' arrival and investigation of the immigration violation.

Moreover, as explained in greater detail above, reasonable suspicion or consent allows an officer to legally extend a traffic stop beyond its initial scope. United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000).[5] In this case, well before the traffic stop concluded, Deputy

---

[5]The government asserts that there was no continued detention of Mr. Dameshghi in this case, apparently contending that the encounter following the traffic stop was consensual. (Govt's Opp'n at 15, 16.) The court need not determine whether the questioning in this case

13

Kochanowski had reasonable suspicion of an immigration violation and thus a lawful basis for continuing his investigation into Mr. Dameshghi's status in the country.  United States v. Soto-Cervantes, 138 F.3d 1319, 1324 (10th Cir.) (permitting continued detention to investigate possible immigration violation), cert. denied, 525 U.S. 853 (1998).

During the course of citing Mr. Dameshghi for the equipment violation, Deputy Kochanowski learned that Mr. Dameshghi was not a citizen of the United States and that he possessed an expired Resident Alien card.  (Tr. at 15-16.)  Given these facts, Deputy Kochanowski acted reasonably in calling the ICE agents who were nearby and available to assist. See Soto-Cervantes, 138 F.3d at 1323-24 ("By calling INS agents to the scene, the officers were pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly.").  Upon their arrival, the ICE agents acted diligently and according to their authority in investigating Mr. Dameshghi's immigration status.  See 8 U.S.C. § 1357(a)(1) (authorizing immigration officials to interrogate, without warrant, "any alien or person believed to be an alien as to his right to be or to remain in the United States"); see also United States v. Cota-Herrera, 75 Fed. Appx. 695, 2003 WL 21804443 (10th Cir. Aug. 6, 2003) (unpublished).  Accordingly, the court finds that Deputy Kochanowski and the ICE agents had reasonable suspicion sufficient to detain defendant while they inquired about his immigration status.  Therefore, his continued detention was not unlawful.

### C. Mr. Dameshghi's Consent to Search the Vehicle

Having determined that the detention was lawful, the remaining issue concerns the search

---

occurred during a consensual encounter because, based on the court's review of the record, the court concludes that the ICE agents and Deputy Kochanowski had reasonable and articulable suspicion to detain Mr. Dameshghi for further questioning regarding his immigration status.

of Mr. Dameshghi's vehicle.  Mr. Dameshghi appears to concede that he consented to the search of his vehicle, but argues that because his detention was unlawful, his subsequent consent was "fruit of the poisonous tree," and therefore also invalid.  (Def.'s Mem. in Supp. at 12 ("The ICE agents' search and seizure of $36,400.00 was a product of unlawful detention . . . must be suppressed as a product of a fourth amendment violation.")); see United States v. Gregory, 79 F.3d 973, 979-80 (10th Cir. 1996) (holding consent to search was tainted by preceding illegal detention and therefore invalid).  However, because the essential premise of Mr. Dameshghi's argument is flawed (the unlawfulness of his detention), his conclusion does not follow.  In other words, because this court has determined that Mr. Dameshghi was lawfully detained, his consent to search the vehicle cannot be the "fruit" of a "poisonous" detention.

To the extent Mr. Dameshghi's motion and supporting memoranda can be read as making the additional argument that, even if his detention was lawful, his consent to search was the product of coercion and therefore invalid, this argument fails.  It is well established that an officer may conduct a warrantless search consistent with the fourth amendment if the challenging party gives his or her voluntary consent prior to the search.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  The government must demonstrate that consent was given without duress or coercion, express or implied.  See United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Whether a person has voluntarily consented to a search is a question of fact that the district court must evaluate under the totality of the circumstances.  Ohio v. Robinette, 519 U.S. 33, 39-40 (1996).

The fact that Mr. Dameshghi was detained at the time he gave consent is not dispositive as to the voluntariness of his consent.  See United States v. Watson, 423 U.S. 411, 424 (1976)

("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). And, Tenth Circuit precedent explicitly provides that the fact of an investigative detention, standing alone, is not so coercive as to render the consent of the detained involuntary. United States v. Contreras, 506 F.3d 1031, 1037 (10th Cir. 2007) (a person may voluntarily consent to a search even while being lawfully detained); United States v. Doyle, 129 F.3d 1372, 1377 (10th Cir. 1997) ( "Consent to search may be voluntary, even though the consenting party is being detained at the time consent is given."); United States v. Flores, 48 F.3d 467, 468-68 (10th Cir.) (individual may voluntarily consent to search during course of investigative detention), cert. denied, 516 U.S. 839 (1995); United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993) ("Valid consent may be given by a person being detained."). Rather, detention is simply one of the factors to consider in assessing whether the totality of the circumstances would have communicated to a reasonable person that he or she was not free to decline the officer's request to search. See Contreras, 506 F.3d at 1037.

In this case, aside from the fact of detention, none of the other traditional factors weighing against voluntary consent are present. The agents did not harass or threaten Mr. Dameshghi, nor did they display or brandish a weapon or use aggressive and threatening language. The agents requested permission to search the vehicle in public view, on the side of the road, during the course of a calm and professional conversation. (Tr. at 50, 63, 66, 79.) Sometime thereafter, to memorialize the oral consent, Agent Hoover provided Mr. Dameshghi with a written consent to search form, which he signed. (Pl.'s Ex. 2.) Not only did the agents secure both oral and written consent, but the written consent form expressly states that Mr. Dameshghi authorized the search of his vehicle "voluntarily and without threats, promises,

pressure, or coercion of any kind." (Pl.'s Ex. 2.) The Tenth Circuit has routinely found consent given under similar circumstances to be free of unlawful coercion. See, e.g., United States v. Contreras, 506 F.3d 1031 (10th Cir. 2007); United States v. Zubia-Melendez, 263 F.3d 1155, 1162-63 (10th Cir. 2001); United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). Accordingly, the court concludes that Mr. Dameshghi voluntarily consented to the search of his vehicle, and therefore the search did not constitute a Fourth Amendment violation.

## CONCLUSION

For the reasons discussed above, it is hereby ordered that the defendant's motion to suppress is DENIED.

Dated this 31st day of July, 2009.

_____
Dee Benson
United States District Court Judge